South Porto Rico Sugar Company, Plaintiff and Appellant, *v.* Manuel V. Domenech, Treasurer of. Puerto Rico, Defendant and Appellee.

No. 5589. Argued December · 6, 1932.—Decided December 20, 1933.

*Frazer & Castro Fernández* for appellant. *Charles E. Winter, Attorney General,* and *M. Rodríguez Serra, Assistant Attorney General,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

The plaintiff, a corporation organized under the laws of Puerto Rico, brought this action to recover the sum of $18,443.59 paid under protest as taxes.

The defendant answered admitting certain facts and denying others. In short, he maintained the assessment.

On February 5, 1929, both parties stipulated that Rafael Carrión Pacheco be appointed referee, to ascertain the true value as of January 15, 1925, of sixteen of the eighteen properties referred to in the complaint, whether houses Nos. 25 and 59, assessed at $3,400, actually existed, whether the eleven kilometers of railroad track assessed in the Municipality of Añasco were included as part of the 33.5 kilometers already assessed, and whether the radio equipment separately assessed was included in the assessment of the telephone and telegraph. The stipulation was approved by the court and the referee rendered his report on April 8, 1929. He fixed the value of each of the properties specified and concluded that houses Nos. 25 and 59 did not exist; that the radio equipment was not included in the assessment of the telephone and telegraph; and that the eleven kilometers of railroad track were part of the 33.5 kilometers separately assessed.

The report of the referee was finally approved by the court on June 21, 1930, and after the trial was held, the court accepted the valuation placed on the property by the referee and excluded from the assessment the house numbered 59, valued at $600 because it did not exist; the eleven kilometers of railroad track in Añasco, assessed at $15,400, because they were included in another assessment; and the laboratory, the pump, and the oil tanks, assessed at $10,000, $10,000, and $41,000 respectively, because it considered them as an integral

part of the factory; and in consequence thereof it directed that the Treasurer of Puerto Rico return to the plaintiff the sum of $4,405.51, with interest thereon at 6 per cent per annum as from February 20, 1926. Feeling aggrieved by that decision, the plaintiff took the present appeal, which involves the only two questions of importance decided by the court against the plaintiff, to wit: that the offices, the warehouses for sugar, and the other storehouses, assessed by the referee respectively at $3,000, $100,000, $58,525, and the spare parts valued at $175,000, did not form an integral part of the factory under the method of assessment followed, and that the assessment of the sugar factory at 115 per cent of the standard basis used by the Treasurer was illegal.

What was the method followed by the Treasurer in this case? Juan Martínez Chapel, assessor of corporations of the Treasury Department of Puerto Rico, explained it at the trial as follows: After determining the daily capacity of the mills of the central, the number of tons is multiplied by $550, and the result is the assessment. This was due to a resolution adopted by the Board of Equalization and Review for the purpose of establishing a uniform valuation after certain investigations and hearings attended by the owners of the centrals.

The appellant does not attack the method. It expressly states that it is in accord with it, but maintains that when applied to its case, since the average daily output of its factory is 4,103 tons, by multiplying that average by $550, the result would be $2,256,650, said to be a fair valuation, and not $2,595,140. The latter amount involves an adverse balance of $338,490 arrived at by increasing by 15% the $550, or the amount by which the number of tons of sugar produced daily by the central should have been multiplied in order to compute its value.

Regarding this increase, Martínez Chapel testified that at first the Board of Equalization and Review fixed the sum of $605 as the amount by which the number of tons produced

daily should be multiplied, and when said sum was reduced to $550 by reason of the intervention of the owners of the centrals, "a condition was annexed to the effect that in proportion to the number of hours during which each central operated, a percentage of the basic rate would be applied that would vary from 60 per cent to 115 per cent according to the number of operating hours of the central."

He further stated that the Guánica Central, in 1924–25, was assessed at 110 per cent, and in 1925–26 at 115 per cent; that he does not recall whether any central was assessed at 60 per cent; that there were other centrals assessed at more than 100 per cent, but that he does not recall if any other, besides Guánica, was assessed at the rate of 115 per cent.

From an analysis of the testimony of this witness it may be inferred that the board considered that in order to fix the just value of each central, there should be taken into account, besides the number of tons it was capable of producing, the speed with which it operated, setting 100 per cent as the standard of rapidity, surely because it thought that although said element introduced an apparent inequality among the centrals of the Island, it actually tended to effectuate the principle of equality, because in reality the faster a factory operates the more valuable it is.

Before stating our definite views on this point we shall consider another question involved herein, namely: whether the offices, the sugar warehouses, the other storehouses, and the spare parts do not form an integral part of the factory for the purpose of fixing the $550 basis, by which the number of tons must be multiplied in order to determine the value of the factory, since, we think that both questions are so intimately related to each other that in order to arrive at a fair solution of either, they should be considered jointly.

The theory of the plaintiff and appellant is that since the offices, warehouses, and spare parts are directly connected with the sugar factory, they should be considered as an

integral part thereof. That of the defendant is that in order to fix the $550, by which the number of tons should be multiplied, the only thing to be taken into account should be "the value of the machinery and the building in which it is located."

Regarding the sugar warehouses, counsel for the plaintiff put the following questions to the witness, Martínez Chapel:

"Q. But any sugar factory or central must have a place to store it before it is shipped?—A. Yes, sir, but all the factories have warehouses apart from the place where they manufacture.—Q. Then they are separately assessed?—A. Yes, sir.—Q. Apart from the factory?—A. Yes, sir."

And in regard to the case where the place of storage might be situated in the same building as the factory, he was asked: "Q. But you agree with us that if we transferred our office, our chemical laboratory, and our saltwater pump to the factory proper we would not be obliged to pay that tax?" He answered: "A. If the Central Guánica or any other central did it, the method would have to be changed. If it had such a large roof that it would cover a town we would have to change the method."

The witness was then examined by counsel for the defendant, thus:

"Q. Regarding the theory of $550 per ton produced daily, to what does that refer; is it to the machinery, to the mill, or to the whole central and all its properties?—A. To the factory of a sugar central. The factory building and the factory.—Q. Where the mills and other machinery fit for producing sugar are located?—A. Yes, sir, mill, cane-juice tank, sugar evaporator, and the buildings necessary to cover all the machinery.—Q. Do you know of any case of a central in Puerto Rico where they have separate buildings and are exempt from taxation?—A. I do not know of any.—Q. So that the case of the South Porto Rico Sugar Company has not been treated as a special case as regards the method of assessment?—A. No sir, it has not been treated as a special case; it is the same with everybody.—Q. Where is there a sugar warehouse in another central as-

sessed similarly as that of the South Porto Rico Sugar Co?—A. Yes, sir.—Q. In accordance with the value you have considered as reasonable and just?—A. Yes, sir."

If the theory of the plaintiff be independently considered it truly appears to be logical. From the office are directed certain sections of the factory, the warehouses are used to store the products of the factory, and the spare parts are ready to take the place of those becoming disabled in the factory; and this being so, the whole of it is an integral part of the business.

But if we examine said theory in the light of the procedure followed by the Treasurer to arrive at the estimate of $550, it loses all its force since that sum was determined by taking only the factory into consideration, that is to say, "the mill, cane-juice tank, the sugar evaporator, and the building required to house all this machinery."

The procedure must have consisted in an investigation of the cost of the different centrals and of their actual capacity, an average being then computed, represented by the aforesaid amount. If the average was arrived at without taking into account the warehouses, offices, and spare parts, it would not be fair to include them in the case of the plaintiff. It would be contrary to the principle of equality of assessment so earnestly invoked by the plaintiff.

Now, if the sum of $550 was computed through the above-mentioned procedure, how can the practice of reducing the said sum in certain cases and increasing it in others be explained?

Said practice is not wholly devoid of justification, for really if the value of the property for taxation purpose is its market value, a powerful mill as such is worth more than one of small capacity, irrespective of the separate value of each piece of machinery, or of each square meter of the construction.

But if this is so, how is it to be accounted for? If the plaintiff's central can reach such an extraordinary produc-

tion capacity that it surpasses by 15 per cent the standard fixed by the Treasurer, is this not due to its having available spare parts whereby the interruptions are reduced to a minimum, and warehouses which enable it to safely store the huge daily production?

The difference of from 60 to 125 per cent in the amount —$550—by which the number of tons of sugar manufactured daily must be multiplied in order to compute the value of the central, could only be justified by the difference in the process of non-inclusion, as an integral part of the factory, of all those accessories that contribute to the output, such as warehouses and spare parts.

For that reason we stated at the beginning that both questions were intimately connected with each other. We think that the Treasurer can not, without incurring in notorious injustice, apply one rate and disregard the compensating elements.

Examining the evidence we find that the method of computing the multiple on a scale of from 60 to 125 per cent was applied for one or two years, and then abandoned altogether. This being so, it appears to us that a fair solution to the problem is to sustain the separate assessment of the office, the warehouses, and the spare parts, and to revoke the one made by multiplying by 115 per cent of $550 the daily capacity in tons of the factory of the central. The multiplication should be by $550.

According to the estimate of the plaintiff, the amount that should be returned to it on this basis is $5,246.00. The judgment appealed from should be modified in that sense, and as thus modified affirmed.